**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

CHUBB NATIONAL INSURANCE
COMPANY, et al.,

             Plaintiffs,

      v.

JONATHAN D'CUNHA, M.D., Ph.D.,

             Defendant.

_____

DR. JONATHAN D'CUNHA,

             Third-Party Plaintiff,

      v.

TRI-CENTURY INSURANCE
COMPANY, et al.,

             Third-Party Defendants.

_____

CRESTBROOK INSURANCE
COMPANY,

             Intervening Plaintiff,

      v.

TRI-CENTURY INSURANCE
COMPANY, et al.,

             Third-Party Defendants.

2:22-CV-1042-NR

## OPINION

**J. Nicholas Ranjan, United States District Judge**

This is an insurance-coverage case involving insurance policies issued by Tri-Century, Chubb, and Federal. The parties asked and the Court agreed to stay discovery and allow them to brief the question of whether the insurers have a duty to defend two policyholders in an underlying state-court action. Now before the Court are competing cross-motions on the issue of the duty to defend. For the following reasons, the Court finds that Tri-Century owes its insureds a duty to defend the underlying state-court action, but that extrinsic evidence is needed to assess Chubb's and Federal's duty to defend based on an exception to an exclusion that may potentially trigger a defense duty.

## BACKGROUND

### I.   The underlying state-court third-party complaint.[1]

Dr. James Luketich, Dr. Jonathan D'Cunha, and Dr. Lara Schaheen all worked together at UPMC. Dr. Luketich and Dr. D'Cunha were both cardiothoracic surgeons. Dr. Luketich chaired the Cardiothoracic Surgery ("CT") Department. ECF 70-3, ¶ 237.   Dr. D'Cunha was the chief of the CT Department's Division of Lung Transportation/Lung Failure, and he reported to Dr. Luketich. *Id.* at ¶ 243. Dr. Schaheen was a surgical resident who worked with both men. *Id.* at ¶ 239.

Drs. D'Cunha and Schaheen began an inappropriate relationship at work, and rumors spread about their affair. *Id.* at ¶¶ 244, 247, 249-250. Around that time, Dr. D'Cunha also came under scrutiny for other reasons, including for charges of

---

[1] The following facts derive from the third-party complaint Dr. Luketich filed against Dr. D'Cunha and Dr. Schaheen in a state-court medical malpractice action. Drs. D'Cunha and Schaheen are seeking insurance coverage in that case. Because the underlying factual allegations in a complaint determine an insurer's duty to defend, the Court accepts them as true for present purposes. *Erie Ins. Exch. v. Moore*, 228 A.3d 258, 265 (Pa. 2020) ("The truth of the complaint's allegations is not at issue when determining whether there is a duty to defend; the allegations are to be taken as true and liberally construed in favor of the insured." (cleaned up)).

plagiarism and other academic misconduct. *Id.* at ¶¶247-258. As a result, Dr. Luketich rotated Dr. Schaheen to a different team in order to separate her from Dr. D'Cunha. *Id.* at ¶¶ 231, 254. Tension had already existed between Drs. Luketich and D'Cunha. *Id.* at ¶ 252. But this transfer made the two paramours furious, and they began conspiring to take revenge on Dr. Luketich. *Id.* at ¶ 255.

As part of their scheme, Drs. D'Cunha and Schaheen surreptitiously recorded Dr. Luketich on at least two occasions, aiming to catch him engaging in inappropriate or unlawful conduct and to use that evidence against him. *Id.* at ¶¶ 260-261. This included placing a secret recording device that captured a conversation in an operating room observation gallery. *Id.* at ¶ 262. That conversation was between Dr. Luketich and his treating physician, and the two discussed Dr. Luketich's personal use of Suboxone. *See id.* at ¶ 232, 262. Drs. D'Cunha and Schaheen then disseminated that confidential information. *Id.* at ¶ 266.

The conspiracy escalated when Dr. Luketich led an investigation into possible research misconduct by Drs. D'Cunha and Schaheen. *Id.* at ¶¶ 269, 272. To that end, they made multiple complaints to various authorities about Dr. Luketich. *Id.* at ¶ 233. These included two anonymous complaints to UPMC, *id.* at ¶¶ 274-275; a complaint to the Pennsylvania Board of Medicine, *id.* at ¶ 281; and the Accreditation Council for Graduate Medical Education, *id.* at ¶ 282. They sent a complaint letter and recording of Dr. Luketich's O.R. conversation to a competing academic medical center. *Id.* at ¶¶ 283, 288. They also encouraged law enforcement investigations. *Id.* at ¶ 230. Dr. D'Cunha even brought a federal *qui tam* action against Dr. Luketich and UPMC. *Id.* at ¶ 303; *see United States ex rel. D'Cunha v. Luketich*, No. 19-495, 2022 WL 2359417 (W.D. Pa. June 30, 2022).

Finally, Drs. D'Cunha and Schaheen misappropriated patient medical records in order to encourage private lawsuits. ECF 70-3 at ¶¶ 269, 280, 292. As particularly salient here, Drs. D'Cunha and Schaheen accessed Bernadette Fedorka's medical

records and provided them to Dr. Schaheen's stepfather (a lawyer).  *Id.* at ¶¶ 290-92. The goal was to "instigate" a malpractice suit against Dr. Luketich (and others).  *Id.* at ¶ 292.

It worked.  Mr. and Mrs. Fedorka ended up bringing a medical malpractice claim in state court against Dr. Luketich (and others).  *Id.* at ¶ 296.  The suit stemmed from Mrs. Fedorka's March 2018 botched lung transplant, which had been performed by another doctor in the department.  *Id.* at ¶ 289.

As part of that state-court action, Dr. Luketich sued Drs. D'Cunha and Schaheen, alleging that the two conspired to "take [him] down and watch him die a slow death."  *Id.* at ¶ 279.  That third-party complaint is the one at issue here in assessing the duty to defend, and includes ten counts, alleging:

A.   Count I (Civil Conspiracy) – Drs. D'Cunha and Schaheen tried "to persuade lawyers and government officials to initiate investigations and bring lawsuits…for the unlawful purpose of causing injury to Dr. Luketich, as well as to enrich themselves and others at his expense[.]" *Id.* at ¶ 308.

B.   Count II (Injunctive Relief).

C.   Count III (Wiretapping) and Count V (Invasion of Privacy) – they "knowingly and intentionally intercepted, caused to be intercepted, and/or received confidential patient-physician communications."  *Id.* at ¶¶ 321, 333, 339.

D.   Count IV (Defamation Per Se) and Count VII (Commercial Disparagement) – they "repeatedly made false and defamatory allegations verbally and in writing" "with willful intent to injure…Dr. Luketich[.]"  *Id.* at ¶¶ 327, 330 (cleaned up).  This negatively affected Dr. Luketich's personal reputation as well as his business reputation. *Id.* at ¶ 360.

3

E.   Count VI (Tortious Interference) – they "used the unlawfully obtained private information...to strategically target Luketich's status" at UPMC, aiming "to ruin his professional reputation, get him fired, stripped of his license and therefore render him unemployable as a physician[.]"  *Id.* at ¶¶ 349-350.

F.   Count VIII (Replevin) and Count IX (Conversion) – they "knowingly and intentionally obtained and dispersed confidential, HIPAA-protected patient medical records" illegally.  *Id.* at ¶ 363.

G.   Count X (Abuse of Process) – finally, they "conjured up a legal process by recruiting the Fedorkas (and others) to bring a baseless lawsuit...."  *Id.* at ¶ 395.

## II.   Insurance policies.

### A.   Tri-Century

Tri-Century is UPMC's "wholly owned self-insured subsidiary."  ECF 12, ¶ 2. As UPMC employees, both Dr. D'Cunha and Dr. Schaheen carried personal liability insurance issued by Tri-Century.  The policy's coverage for individual policyholders includes:

> damages due to an injury to which this insurance applies caused by a medical incident which occurs during the policy period arising out of the practice of the insured's profession as a physician, surgeon or dentist.

ECF 12-1, p. 1.

Tri-Century so far has refused to defend either Dr. D'Cunha or Dr. Schaheen against Dr. Luketich's third-party claim in the *Fedorka* action, even though – as Dr. D'Cunha points out – it is defending every other UPMC defendant in the *Fedorka* case.  ECF 87, p. 6; ECF 12-2.

**B.    Chubb/Federal**

Chubb issued a Masterpiece homeowners' insurance policy to Dr. D'Cunha, including for personal liability.  ECF 22, ¶¶ 17-20.  Federal provided excess coverage that follows form.  *Id.* at ¶¶ 27-29.  The Chubb policy covers damages:

> for personal injury or property damage which takes place anytime during the policy period and are caused by an occurrence, unless stated otherwise or an exclusion applies.

ECF 30-1, p. 183.

The policy defines "occurrence" to include:

> an accident which begins within the policy period resulting in bodily injury, shock, mental anguish, mental injury, or property damage; or an offense first committed within the policy period resulting in: false arrest, false imprisonment, or wrongful detention; wrongful entry or eviction; malicious prosecution or humiliation; or libel, slander, defamation of character, or invasion of privacy, to which this insurance applies.

*Id.*  Chubb initially declined to defend Dr. D'Cunha, but is now defending him subject to reservation of rights.  ECF 87, p. 9.

**C.    Crestbrook**

Crestbrook provided a homeowners' insurance policy, including for personal liability, to William Wu – who Dr. Schaheen represented was her domestic partner during the relevant timeframe.  ECF 56, ¶¶ 6-8.  Therefore, the policy also covers Dr. Schaheen.  Crestbrook's policy states that it will pay damages:

> due to an occurrence resulting from (a) Negligent personal acts or negligence arising out of the ownership, maintenance or use of real or personal property at an insured location; and (b) Other personal activities anywhere in the world, unless stated otherwise or an exclusion applies.

ECF 70-1, p. 47.  Crestbrook initially denied coverage, but is now defending Dr. Schaheen subject to reservation of rights.  ECF 56, ¶¶ 23-24.

### III.   The instant federal case.

Chubb and Federal (together "Chubb") filed a federal-court complaint against Dr. D'Cunha on July 19, 2022, seeking a declaratory judgment that it had no duty either to defend or to indemnify Dr. D'Cunha in the underlying state-court case.  ECF 1.  Dr. D'Cunha responded with his own request for declaratory judgment, and claimed that Chubb breached its duties to him.  ECF 8.  Dr. D'Cunha then filed a third-party complaint against Tri-Century, seeking a declaration that Tri-Century, too, owed him a defense and indemnification.  ECF 12.

Crestbrook later intervened and filed an intervenor complaint against Tri-Century, with Dr. Schaheen as a nominal defendant, seeking equitable contribution, equitable subrogation, and declaratory judgment as to Tri-Century's duty to defend and indemnify Dr. Schaheen.  ECF 56.  Dr. Schaheen, for her part, filed a counterclaim against Crestbrook, stating that although Crestbrook acknowledged a duty to defend her, it also owed her indemnification.  ECF 70.

After convening a status conference, at the parties' request, the Court agreed to stay discovery and attempt to resolve the duty-to-defend issue first.  ECF 72.  To that end, Chubb filed a motion for judgment on the pleadings, seeking a declaration that it had no duty to defend Dr. D'Cunha.  ECF 84.  Dr. D'Cunha countered with a motion for partial summary judgment asking the Court to declare precisely the opposite.  ECF 100.  He also filed a motion for summary judgment regarding Tri-Century's duty to defend him, ECF 86, which Tri-Century countered with a cross-motion for judgment on the pleadings.  ECF 97.  Crestbrook filed a motion for partial summary judgment seeking a declaration that Tri-Century, rather than Crestbrook, has the duty to defend Dr. Schaheen.  ECF 82.  Dr. Schaheen agrees; she filed her own motion for partial summary judgment to that effect, and she joined in both Crestbrook's and Dr. D'Cunha's.  ECF 90.  The Court held oral argument on the

matter on June 14, 2023.  ECF 127; ECF 128.  Each motion is now ready for disposition.

## DISCUSSION & ANALYSIS[2]

An insurer's duty to defend is broader than its duty to indemnify.  *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 896 n.7 (Pa. 2006).  So an insurer might have a duty to defend the insured even if it ultimately has no duty to indemnify him.  *Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 746 (3d Cir. 1999).

In determining whether there is a duty to defend, "the Court must compare coverage under the policy with the factual allegations contained in the four corners of the complaint."  *Mericle*, 2010 WL 3505117, at *5-6 (citing *Whole Enchilada, Inc. v. Travelers Prop. Cas. Co. of Am.*, 581 F. Supp. 2d 677, 694 (W.D. Pa. 2008) (Fischer, J.)).  If the complaint "states a claim that potentially comes within the coverage of the policy," the duty to defend is triggered.  *Britamco Underwriters, Inc. v. Emerald Abstract Co.*, 855 F. Supp. 793, 797-99 (E.D. Pa. 1994) (citing *Cadwallader v. New Amsterdam Cas. Co.*, 152 A.2d 484 (1959)).  "If a single claim in a complaint containing multiple claims is potentially covered, the duty to defend attaches until the underlying plaintiff can no longer recover on a covered claim."  *Mericle*, 2010 WL 3505117, at *6 (citing *Frog, Switch & Mfg.*, 193 F.3d at 746)).  "[T]he complaint must be construed liberally, the factual allegations must be accepted as true, and all doubts as to coverage resolved in favor of the insured."  *Id.*

Notably, the question of coverage does not turn on the specific request for relief or cause of action named in the complaint; instead, a court must examine the

---

[2] The legal standard for summary judgment and for judgment on the pleadings is similar.  *See Rosenberg v. Hudson Ins. Co.*, No. 22-137, 2022 WL 16553271, at *2 (W.D. Pa. Oct. 31, 2022) (Horan, J.) ("A motion for judgment on the pleadings may be granted where the movant clearly establishes that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." (cleaned up)).

underlying factual allegations. *Mut. Benefit Ins. Co. v. Haver*, 725 A.2d 743, 745 (Pa. 1999). The "insurer must provide a defense even if such suit is groundless, false, or fraudulent." *Young*, 2009 WL 2170105, at *2 (cleaned up). But "[t]he overstatement of a claim or the hyperbole of a pleader should not control whether an insured is entitled to a defense." *Britamco*, 855 F. Supp. at 799.

Drs. D'Cunha and Schaheen don't contend that every claim in the state-court third-party complaint against them is covered by their insurance. But they do argue that at least certain claims are covered. Specifically, they point to the claims for defamation and replevin as to Tri-Century. ECF 87, pp. 14, 18. And Dr. D'Cunha points to claims of defamation, invasion of privacy, and abuse of process as to Chubb. *See* ECF 101, pp. 22, 24, 25. If they are right as to any of those counts, the insurers will have a duty to defend for as long as those counts remain part of the case. *Mericle*, 2010 WL 3505117, at *6.

**I.    Tri-Century has a duty to defend because at least Counts IV and VIII of the third-party complaint are potentially covered.**

**A.    The underlying claims were caused by the provision of medical services because they involved the "exercise of medical skill associated with specialized training."**

The Court first turns to the motions pertaining to the Tri-Century policy. Tri-Century has disclaimed any duty to defend, contending that its policy – issued to both Dr. D'Cunha and Dr. Schaheen – does not cover Dr. Luketich's claims against them. Tri-Century argues that Drs. D'Cunha and Schaheen have not met their burden to show that Dr. Luketich's allegations fall within the scope of the policy to trigger coverage at all. Tri-Century argues, in essence, that its policy covers medical malpractice, which has nothing to do with the claims here. The Court disagrees.

In a dispute over whether coverage is triggered in the first place, "the insured bears the burden of proving facts that bring its claim within the policy's affirmative

grant of coverage." *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F. 3d 1440, 1446 (3d Cir. 1996) (citation omitted).   Here, the policy's "Coverage A" provides individual professional liability coverage for:

> [a]ll sums which the insured shall become legally obligated to pay as damages due to an injury to which this insurance applies caused by a medical incident which occurs during the policy period arising out of the practice of the insured's profession as a physician, surgeon or dentist.

ECF 12-1, p. 1.

> The policy, in turn, defines a "medical incident" as:

> any act or omission (a) under Coverage A – Individual Professional Liability – (1) in the furnishing of professional medical or dental services by the insured, an employee of the insured, or any person acting under the personal direction, control or supervision of the insured, or (2) in the service by the insured as a member of a formal accreditation, standards review, ethics or similar professional board or committee, including non-employed committee members[.]

*Id.* at 8.

Thus, the policy provides coverage where the underlying claims are caused by the "furnishing of professional medical services."  Though the Tri-Century policy itself does not expressly define "professional medical services," the Supreme Court of Pennsylvania has held that an act qualifies if it "is a medical skill associated with specialized training." *Physicians Ins. Co. v. Pistone*, 726 A.2d 339, 344 (Pa. 1999).  In doing so, the court "rejected alternative proposed definitions…turning upon whether there was a 'substantial nexus' between the injurious actions and the professional setting, or whether the harmful conduct was 'intertwined with and inseparable from' the medical services provided." *Strine v. Com.*, 894 A.2d 733, 739 n.5 (Pa. 2006). Under this definition, the claims for defamation and replevin in the third-party complaint against Drs. D'Cunha and Schaheen qualify.

Beginning with the defamation claim, certain of the allegedly defamatory statements reflect an exercise in "medical skill associated with specialized training."

Importantly, the practice of medicine, like the practice of law, entails certain ethical duties.   Dr. Luketich acknowledges that Dr. D'Cunha had an "independent responsibility under…professional standards of practice to ensure that the surgeons they operated with were oriented, alert, coherent, and capable to successfully" perform surgery.   ECF 1-1, ¶ 286.  Dr. D'Cunha argues that several of his allegedly defamatory reports arose from this responsibility and relied on his medical judgment. Specifically, his "reporting of a fellow impaired surgeon involved a covered professional medical judgment call that only a physician could make."  ECF 87, p. 2. The Court agrees.

Many of Dr. D'Cunha's statements about Dr. Luketich are medical in nature. For instance, Dr. D'Cunha's anonymous complaint to the Pennsylvania Board of Medicine (referred to in paragraph 281 of the state-court third-party complaint) included a section called "Medical Misconduct."  ECF 102-1, pp. 4-7.  This section included allegations such as:

> prolonged OR times," "disregard[ing] standard of care for thoracic oncology patients," "intentional delay of necessary and indicated patient care," "inability to practice medicine with reasonable skill and safety due to impaired illness," and "lack of sterile technique resulting in direct complications.

*Id.*  Assessing what falls below a medical standard of care certainly "raises questions of medical judgment beyond the realm of common knowledge and experience." *Grossman v. Barke*, 868 A.2d 561, 570 (Pa. Super. Ct. 2005) (distinguishing regular negligence claims from medical malpractice negligence claims) (citation omitted). Thus, at least some of the allegedly defamatory statements concerned medical incidents.  This is enough to trigger coverage.

The replevin claim is also potentially covered.  With respect to this claim, Dr. Luketich's third-party complaint alleges that Drs. D'Cunha and Schaheen "knowingly and intentionally obtained and dispersed confidential, HIPAA-protected

10

patient medical records that are the sole property of UPMC, without authorization of the patient or their lawful representative or guardian." ECF 70-3, ¶ 363. Management of patient medical records and privacy involves specialized training in order to comply with extensive regulations. To that end, other courts, applying Pennsylvania law, have recognized that management of patient medical information is part of "professional medical services." *E.g., Princeton Ins. Co. v. LaHoda*, No. 95-5036, 1996 WL 11353, at *4 (E.D. Pa. Jan. 4 1996) ("Clearly, the allegations that Dr. LaHoda improperly disclosed medical information about his patient…constitute a 'professional medical' act or omission[.]"); *Nationwide Mut. Ins. Co. v. Garzone*, No. 07-4767, 2009 WL 2996468, at *18-19 (E.D. Pa. Sept. 17, 2009) (holding that "failing to properly obtain consent for organ donation, preparing or relying on faulty documentation, and negligently entrusting the bodies" arose from "the exercise of the…Defendants' professional skills as cremators or undertakers," which concerned skills associated with specialized training). And Dr. Luketich himself acknowledges that these obligations are a core part of the medical profession. ECF 70-3, ¶ 368 (describing the alleged misuse of patient records as violating the "standards and practice of [the medical] profession everywhere"). Therefore, the claim for replevin is also potentially covered.

> **B.     Tri-Century's counterarguments fail.**

Tri-Century makes two primary arguments in response – neither of which is persuasive.

First, it asserts that "professional medical services" means only "the provision of medical treatment or the failure to provide such treatment." ECF 98, p. 13 (quoting *Princeton Ins. Co. v. Kosoy*, No. 98-4985, 1999 WL 79055, at *3 (E.D. Pa. Feb. 9, 1999), *aff'd without opinion* 281 F.3d 223 (3d Cir. 2001)). The Court finds that such a restrictive construction is not appropriate in light of the policy's language; the policy specifically labels itself as "professional liability insurance," rather than "medical

malpractice insurance." ECF 12-1, p. 2. Additionally, the *Kosoy* case, on which Tri-Century relies, predated the controlling *Pistone* decision. And furthermore, it is distinguishable. *Kosoy* involved "claims for negligence, fraud and breach of contract arising solely out of the billing practices of Dr. Kosoy's chiropractic business." 1999 WL 79055, at *3. Unlike this case, the allegations there had nothing to do with anything involving medical judgment.[3]

Second, Tri-Century argues that a broad reading of "professional medical services" would effectively render a portion of the policy's definition of "medical incident" superfluous. Under the policy, a "medical incident" can include an act or omission:

> (2) in the service by the insured as a member of a formal accreditation, standards review, ethics or similar professional board or committee, including non-employed committee members

("option 2"). ECF 12-1, p. 8. Those boards and committees often have a role in reporting malpractice. So, Tri-Century argues, if reporting misconduct were part of "professional medical services," there would be no need for option 2. ECF 115, pp. 10-11 (citing *USX Corp. v. Liberty Mut. Ins. Co.*, 444 F.3d 192, 200 (3d Cir. 2006)).

But the two provisions do not completely overlap. Option 2 very clearly and specifically addresses service on a board or committee; it operates no differently than a form of Directors and Officers coverage, which has a distinct and separate purpose.

---

[3] Tri-Century cites *Central Dakota Radiologists v. Continental Casualty*, in which the district court, applying North Dakota law, found that a requirement that an injury be "caused by" professional medical services is more restrictive than requiring that it "arise out of" those services. 769 F. Supp. 323, 326-27 (D.N.D. 1991). The Court doesn't find *Central Dakota Radiologists* to be persuasive. First, the court's analysis there was not supported by any authority. Second, the court there was considering whether an antitrust claim was covered – something wholly outside the scope of coverage. Third, the causation standard doesn't alter the result here, because the underlying state action expressly alleges causation. *See generally* ECF 70-3 (repeatedly stating that third-party defendants' actions "directly and proximately caused separate and distinct harm and injury").

Thus, the option 2 provision is not superfluous, and it does not change the Court's interpretation of "professional medical services."

In short, the underlying third-party complaint very clearly asserts claims caused by the provision of medical services by Drs. D'Cunha and Schaheen, and therefore Tri-Century owes its insureds a duty to defend.[4][5]

### C.   The Court defers on ordering reimbursement or payment of any attorneys' fees.

As part of their motions, Drs. D'Cunha and Schaheen have submitted counsel invoices from the underlying case and have requested payment of those fees by Tri-Century, in the event that the Court finds the existence of a duty to defend.  ECF 89; ECF 118; ECF 126; ECF 130.  Crestbrook also has sought equitable contribution in its complaint from Tri-Century because Crestbrook would sit excess to any available coverage provided by Tri-Century to Dr. Schaheen.  ECF 56, Count I.

The Court finds that because Tri-Century owes Drs. D'Cunha and Schaheen a defense, it also owes certain defense costs that have not yet been paid, and that Crestbrook has a right to equitable contribution for the defense costs that it has paid to Dr. Schaheen.  *Cont'l Cas. Co. v. Pennsylvania Nat'l Mut. Cas. Ins. Co.*, 390 F. Supp. 3d 614, 621, 625 (E.D. Pa. 2019) ("To recover on a claim of equitable contribution under Pennsylvania law, an insurer must show by a preponderance of

---

[4] Tri-Century has alluded to other bases for denying coverage to Drs. D'Cunha and Schaheen.  *E.g.*, ECF 12-20, p. 6 (reserving rights); ECF 62, ¶ 92 (citing an exception for an injury "arising out of the performance by Dr. Schaheen of a criminal, fraudulent, or malicious act").  But Tri-Century advances none of those arguments as part of its motion or in response to the other parties' cross-motion, though it has "reserved its right" to do so.  ECF 98, p. 10 n.2.  The time for reserving rights has passed, and so the Court finds that any additional bases for denying a defense by Tri-Century are waived.

[5] The Court does not and need not address Dr. D'Cunha's other arguments for coverage, such as the impact of blame-shifting allegations or the effect of Pennsylvania Rule of Civil Procedure 2255.

the evidence that (1) it is one of several parties liable for a common debt or obligation; and (2) it discharged the debt for the benefit of the other parties....A claim for equitable contribution calls upon the power of the court to design a remedy that is fair." (cleaned up)).

Rather than enter judgment on those amounts at this time, the Court will order the parties to first confer on those issues to attempt to reach agreement.

## II. Extrinsic evidence is necessary to determine Chubb's duty to defend.

Chubb provides personal liability insurance coverage as part of Dr. D'Cunha's homeowner's policy. Chubb doesn't contest the grant or scope of coverage. Rather, it argues that two exclusions in its policies apply, stripping Dr. D'Cunha of coverage. Dr. D'Cunha disagrees, arguing that at least the counts in the underlying complaint for defamation, invasion of privacy, and abuse of process are potentially covered, and therefore Chubb must defend him against Dr. Luketich. Up to this point, Chubb has provided a defense, subject to reservation of its rights.

When an "insurer relies on a policy exclusion as the basis for denying coverage, it bears the burden of proving that the exclusion applies. Policy exclusions are strictly construed against the insurer." *Mericle*, 2010 WL 3505117, at *5-6 (cleaned up). Chubb relies on two exclusions: one for intentional acts, and another for business pursuits. But Dr. D'Cunha raises the possibility that an enumerated exception to an exclusion might apply in this case. At this point, the Court finds that it does not currently have a sufficient record to determine whether Dr. D'Cunha is right. So it cannot conclude that either party is entitled to judgment as a matter of law.

### A. Business pursuits exclusion.

The Court first turns to the business pursuits exclusion. Chubb argues that because Dr. D'Cunha's conduct alleged in the third-party complaint was connected to his employment as a doctor at UPMC, this exclusion means that he is not covered. ECF 85, pp. 15-19.

14

The exclusion states:

> [w]e do not cover any damages arising out of a covered person's business pursuits, investment or other for-profit activities, any of which are conducted on behalf of a covered person or others, or business property,

and

> [w]e do not cover damages or consequences resulting from business or professional care or services performed or not performed.

ECF 30-1, pp. 194-195.

At the outset, the Court disagrees with Dr. D'Cunha that the policy's use of "business pursuits" is ambiguous, and that the term must therefore be narrowly construed to mean "outside business interests." ECF 101, pp. 19-20. As the Pennsylvania Superior Court has explained, "activity encompassed within a 'business pursuits' exclusion in an insurance policy requires two elements: 1) continuity, and 2) a profit motive." *Nationwide Mut. Ins. Co. v. Arnold*, 214 A.3d 688, 696 (Pa. Super. Ct. 2019) (citation omitted). "A profit motive may be shown by such activity as a means of livelihood, a means of earning a living, procuring subsistence or profit, commercial transactions or engagements. Additionally, continuity has been described by the Third Circuit as 'customary engagement in the activity.'" *Id.* (citing *Sun Alliance Ins. Co. v. Soto*, 836 F.2d 834, 836 (3d Cir. 1988)). If those tests are satisfied, the question is whether "the occurrence resulting in personal injury arose out of [the] business pursuit." *Id.* at 700 (cleaned up).

Under that test, the Court finds that at least two claims against Dr. D'Cunha were not "business pursuits" within the meaning of the exclusion. Specifically, as part of the defamation claim, Dr. Luketich accused Dr. D'Cunha of defamation directed to a rival medical center, and as part of the abuse of process claim, he accused Dr. D'Cunha of "recruiting" plaintiffs to bring private lawsuits against him.[6] These

---

[6] *See* ECF 70-3, ¶ 233 ("D'Cunha and Schaheen then distorted and disseminated information…to make false, defamatory allegations…to among others:…(iii) a

activities, on their face, do not evince a "profit motive" associated with being a doctor, and otherwise fall outside the scope of Dr. D'Cunha's professional duties as a doctor at UPMC. *Aetna Cas. & Sur. Co. v. Ericksen*, 903 F. Supp. 836, 841 (M.D. Pa. 1995) (a professor's making "whistleblowing" statements to a newspaper was not a business pursuit because she didn't "have public relations responsibilities for the university.... Nor did the publication of the allegedly libelous statement arise in the context of a class taught by [the insured].").

As in *Arnold* and *Ericksen*, Dr. D'Cunha's job as a doctor did not involve outreach to potential plaintiffs to file lawsuits, or reporting alleged misconduct to a rival medical center regarding Dr. Luketich. It's not enough that Dr. D'Cunha merely learned of supposedly objectionable behavior by virtue of working with Dr. Luketich at UPMC. These allegedly defamatory statements and improper conduct did not arise out of Dr. D'Cunha's regular patient care interactions or other responsibilities as part of his employment.

### B.    Intentional acts exclusion.

Having determined that at least certain aspects of some of the underlying claims do not involve a business pursuit, the Court next turns to the Chubb policy's exclusion for intentional acts, which Chubb argues also bars coverage for Dr. D'Cunha. ECF 85, pp. 10-15.

The exclusion states:

> [w]e do not cover any damages arising out of a willful, malicious, fraudulent or dishonest act or any act intended by any covered person to cause personal injury or property damage, even if the injury or damage is of a different degree or type than actually intended or expected. But we do cover such damages if the act was intended to protect people or property unless another exclusion applies. An intentional act is one whose consequences could have been foreseen by a reasonable person.

competing academic medical center"); *id.* at ¶ 292 (describing the effort to "instigate the malpractice claims here").

ECF 30, p. 194.

To begin with, this language is unambiguous. Dr. D'Cunha tries to suggest otherwise, by pointing out how the policy's coverage grant expressly covers intentional torts as covered occurrences, such as, expressly, "malicious prosecution or humiliation," as well as "libel, slander, defamation of character, or invasion of privacy." ECF 30-1, p. 183. So, according to Dr. D'Cunha, the exclusion cannot strip away these torts. ECF 101, pp. 2-3. But the Court doesn't find that the enumeration of covered intentional torts in the grant of coverage creates an ambiguity with the intentional acts exclusion, for at least two reasons.

First, the coverage grant expressly states coverage is afforded "unless stated otherwise or an exclusion applies." ECF 70-1, p. 47. Exclusions, after all, take away coverage grants, and this language says as much. *1 S.A.N.T., Inc. v. Berkshire Hathaway, Inc.*, 513 F. Supp 3d 623, 626 (W.D. Pa. 2021) (Stickman, J.) ("Policy exclusions…are enforced under their plain meaning. Exclusions from coverage contained in an insurance policy will be effective against an insured if they are clearly worded and conspicuously displayed[.]" (cleaned up)), *aff'd sub nom. Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131 (3d Cir. 2023).

Second, as the Third Circuit has noted, the interplay between enumerated intentional torts in the coverage grant and the intentional acts exclusion can be read consistently. For example, defamation can be established by recklessness, and such a claim would not be barred by the intentional acts exclusion. *Regent Ins. Co. v. Strausser Enters., Inc*, 814 F. App'x 703, 710 n.5 (3d Cir. 2020) ("[T]he unambiguous 'Knowing Violation of Rights of Another' exclusion is a specific component of Coverage B and does not result in illusory coverage for all malicious prosecution claims because it does not apply to claims based on alleged negligence.").

Applying the unambiguous intentional acts exclusion, the third-party complaint clearly pleads a specific intentional scheme "with willful intent to injure" Dr. Luketich by "tak[ing] him down." *E.g.*, ECF 70-3, ¶ 330.

For example, considering the same claims that the Court considered in analyzing the business pursuits exclusion above (defamation to a rival medical center and abuse of process in recruiting plaintiffs to file lawsuits), these claims, as pled, demonstrate Dr. D'Cunha's intent to injure Dr. Luketich. Dr. Luketich avers that "D'Cunha and Schaheen have conjured up a legal process by recruiting the Fedorkas (and others) to bring a baseless lawsuit and therein have caused the intentional publicization of irrelevant, false and defamatory allegations concerning Dr. Luketich for the unlawful purpose of extorting money from him and UPMC[.]" ECF 70-3, ¶ 395. And they sent "another academic medical center outside the Commonwealth of Pennsylvania" "a letter that recited the False and Defamatory Allegations against Dr. Luketich as well as a recording and transcript of what turned out to be the…wiretap." *Id.* at ¶ 283. Recall that the recording captured confidential, sensitive information protected by doctor-patient privilege. ECF 70-3, ¶ 321. Ultimately, "a reasonable person would have foreseen the consequences" of disseminating this information. *Fed. Ins. Co. v. Potamkin*, 961 F. Supp. 109, 112 (E.D. Pa. 1997). So the acts were "intentional" under both caselaw and the policy's terms. Therefore, considering only the four corners of the third-party complaint and the policy's terms, the intentional acts exclusion applies.[7]

---

[7] Dr. D'Cunha also argues that the underlying complaint accuses him of defamation by reckless and negligent conduct. But the Court finds that the allegations of recklessness and negligence are passing legal characterizations, and so hold no weight. *First Liberty Ins. Corp. v. MM*, 259 F. Supp. 3d 264, 269 (E.D. Pa. 2017) ("The law is settled that the mere allegation of negligence through 'artful pleading' is not sufficient to trigger an insurer's duty to defend." (citations omitted)), *aff'd* 745 F. App'x 195 (3d Cir. 2018).

But the exclusion doesn't stop there; it has an exception, which provides:

We do cover such damages if the act was intended to protect people or property unless another exclusion applies.

ECF 30, p. 194.

In assessing an exception to an exclusion, the insured bears the burden of proving an exception's applicability. *Air Prod. & Chemicals, Inc. v. Hartford Acc. & Indem. Co.*, 25 F.3d 177, 180 (3d Cir. 1994) (citations omitted).

Dr. D'Cunha attempts to meet this burden by arguing that he was a whistleblower, and much of the alleged defamatory statements were done to protect others, including patients. For evidence, he points to some of the alleged defamatory statements themselves. Chubb counters by arguing that the "four corners" of the underlying complaint say nothing about Dr. D'Cunha's intent to protect others, and so cannot be raised now.

After careful consideration, the Court believes it needs extrinsic evidence to determine whether this exception to the exclusion applies. Chubb is right that Dr. Luketich very expressly pleads in his underlying complaint that the conduct was done with the intent to harm him, not to protect others. ECF 70-3, ¶ 344 (alleging that Drs. D'Cunha and Schaheen did not act for any legitimate public safety or patient care interest"). But that is to be expected. In the Court's estimation, plaintiffs would rarely, if ever, concede an alternate benevolent purpose for actions that allegedly caused them harm, as this might undermine their claims. Therefore, if a court were only permitted to consider the four corners of the complaint, it could almost never find that an exception to an exclusion applies, and any obligation to defend under such an exception would effectively be illusory.

While the Court acknowledges that the "four corners" rule almost always applies, this is the rare case where extrinsic evidence is necessary to discern whether any of the underlying conduct was done with the intent to protect other parties. "[I]n

19

cases…where the insured bears the burden of showing that an exception to an exclusion applies, the court may consider extrinsic evidence to determine whether there is a duty to defend." *Foremost Inst. Co. v. Nosam, LLC*, 343 F. Supp. 3d 448, 455 (E.D. Pa. 2018) (citing *Air Products*, 25 F.3d at 180); *cf. Nat'l Fire Ins. Co. of Hartford v. Robinson Fans Holdings, Inc.*, No. 10-1054, 2011 WL 2842303, at *7 (W.D. Pa. July 18, 2011) (Ambrose, J.) (holding that the court should not consider extrinsic evidence because the case "did not involve exclusions or exceptions thereto").  Though this rule "appears to be one-sided[,] [t]his construction against the insurer and in favor of the insured…is consistent with general insurance law principles and, in particular, the Pennsylvania rule that requires only a 'potential' of coverage of the allegations in the complaint for the duty to defend to be triggered." *Air Products*, 25 F.3d at 180.  Note, though, that the insurer, too, is permitted to use extrinsic evidence in these circumstances; it may use it to prove that "*no exception* to the exclusion applie[s]," though not "to support the application of the *exclusion*." *Haines v. State Auto Prop. & Cas. Ins. Co.*, 417 F. App'x 151, 153 (3d Cir. 2011) (emphasis added).

This makes sense.  Just as courts must look to a complaint's underlying factual allegations to ensure that parties don't use "artful pleadings designed to avoid exclusions in liability insurance policies," *Erie Ins. Exch. v. Moore*, 228 A. 3d 258, 266 (Pa. 2020) (quoting *Mut. Ben. Ins. Co. v. Haver*, 725 A.2d 743, 745 (Pa. 1999)), so too should courts be wary of "artful pleadings" designed to promote a public relations narrative and potentially avoid exceptions to exclusions.  *See Unitrin Direct Ins. Co. v. Esposito*, 280 F. Supp. 3d 666, 671-72 (E.D. Pa. 2017) ("If a court could not look beyond the complaint in the underlying allegation alleging that the insured assaulted the plaintiff, an insured claiming self-defense could not invoke a duty to defend.").[8]

---

[8] In an unpublished, non-binding opinion, the Third Circuit reversed this case on other grounds.  751 F. App'x 213 (3d Cir. 2018).  But two panel members wrote in dicta that the district court had also "erred by looking beyond the allegations of the underlying complaint to consider Esposito's claim that he acted in self-defense." *Id.*

Dr. D'Cunha points to certain evidence outside of the record, arguing that he acted with the intent to protect others. But the parties in this case had previously agreed to proceed without taking discovery and by arguing that the "four corners" rule applies. The Court finds that it would be inappropriate and unfair to go outside of the "four corners" at this point, without giving both sides an opportunity to take discovery or to otherwise supplement the record with appropriate extrinsic evidence.

For these reasons, the Court will deny the cross-motions on the duty to defend under the Chubb policies, without prejudice to the parties refiling their motions after conducting discovery and supplementing the record.

---

at 215-16. *Esposito*, however, is distinguishable from this one. This case falls squarely within *Air Products* – that is, "potential coverage [is] a given and extrinsic evidence [would be] considered only in connection with proffered exceptions to exclusions, not the threshold question of whether there was coverage in the first place." *Id.* at 216 n.3 (cleaned up); *accord Lupu v. Loan City, LLC*, 903 F.3d 382, 392 (3d Cir. 2018) ("[W]e may not *look for a covered claim* beyond the four corners of [the] complaint[.]" (emphasis added)); *Burchick Const. Co. v. Harleyville Preferred Ins. Co.*, No. 1051 WDA 2012, 2014 WL 10965436, at *6 (Pa. Super. Mar. 10, 2014) (holding that a court should not consider extrinsic evidence when "there is no dispute in this case that, based solely upon the Underlying Complaint, [insurer] does not owe… coverage").

## **CONCLUSION**

For the foregoing reasons, Dr. D'Cunha's motion for partial summary judgment against Tri-Century is **GRANTED**.  Tri-Century's cross-motion for judgment on the pleadings is **DENIED**.  Crestbrook's and Dr. Schaheen's motions for partial summary judgment are both **GRANTED**.

Chubb's motion for judgment on the pleadings is **DENIED** without prejudice. Dr. D'Cunha's motion for partial summary judgment as to the Chubb policies is also **DENIED** without prejudice.  An appropriate order follows.


DATE:  July 31, 2023                              BY THE COURT:


                                                  /s/ *J. Nicholas Ranjan*
                                                  United States District Judge